UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civ. A. No. 19-800 (TSC) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF SUPPLEMENTAL MOTION AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

  The supplemental briefing authorized by this Court has a singular purpose: to determine whether Defendant can demonstrate to the Court's satisfaction that it was reasonably foreseeable that disclosure of iterative drafts of internal talking points and FAQs for Director Comey's discussions with high-level FBI constituencies about closing the investigation of former Secretary of State Clinton (hereinafter, "draft talking points") would harm the FBI's deliberative process. See Mem. Op. (ECF No. 37) at 9, 10 (permitting supplementary submissions "regarding foreseeable harm" that address the "deficiencies identified in [the Court's] opinion"). Defendant has submitted its Supplemental Memorandum of Law in Support of Defendant's Motion for Summary Judgment (ECF No. 45) ("Def's Suppl. MSJ") and the Second Declaration of Michael G. Seidel (ECF No. 45-1) for this purpose.

  Defendant submits this Reply not to rehash all that has come before but, at least in part, to avoid doing so. In short, Defendant responds briefly to identify several fundamental flaws in Plaintiff's Brief in Support of Renewed Motion for Summary Judgment and in Opposition to

1

Defendant's Motion for Summary Judgment (ECF No. 50)("Pl's Renewed MSJ/OPP"). First, Plaintiff had long since conceded that the draft talking points are protected by FOIA Exemption 5 and that the only issue for resolution is whether their release is required by the FOIA Improvement Act of 2016 (hereinafter either "FIA" or "FOIA Improvement Act"). Plaintiff may not reverse course now. Second, litigation of Exemption 5's coverage of draft talking points would be futile. Third, Plaintiff ignores Circuit law and cases decided since the Circuit's recent decision in *Amadis*. And, forth, misapprehends

## I. The Relitigation of Exemption 5 is Foreclosed

First, Plaintiff spends one-third of its brief (pp. 3-8) arguing that draft talking points are not covered by the deliberative process privilege. But that ship has sailed. As the Court recognized in meting out the parameters of Defendant's burden on supplemental briefing, "Judicial Watch does not contest that the deliberative process privilege protects the documents." Mem. Op. at 4 (ECF No. 37). In short, Plaintiff's sole challenge is that Defendant "has failed to meet its burden under the FOIA Improvement Act of 2016" – that is, whether Defendant "could 'reasonably foresee[] that disclosure would harm an interest protected by'" the deliberative process privilege. *Id.* at 5.

The Court was not mistaken. Defendant established, in its motion, that the draft talking points withheld pursuant to Exemption 5 were: (1) intra-agency communications; (2) predecisional to "the final and authoritative statement the FBI determined to make to its internal constituencies;"[1] and (3) deliberative, insofar as reflecting the "give and take" of a deliberative process the goal of which was "to improve, refine, and clarify" the message that "became the

---

[1] Indeed, Defendant characterized the draft talking points as "precisely the type that the deliberative process privilege is intended to protect." Defendant's MSJ at 6.

FBI's final, authoritative pronouncement" on the closing of the Clinton email investigation to two high-level internal constituencies. See generally Defendant's Motion for Summary Judgment ("Def's MSJ") at 5-7 (ECF No. 27). Nowhere in either Plaintiff's Brief in Support of Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's MSJ/OPP")(ECF No. 28) or Plaintiff's Reply Brief in Support of its Motion for Summary Judgment ("Plaintiff's Reply")(ECF No. 33) can a challenge to any of those elements be found.

As a result of Plaintiff's concession, Defendant focused its supplemental brief solely on foreseeability of harm. See Def's Suppl. MSJ at 3. Any attempt to revive abandoned challenges at this late stage should be summarily rejected, as courts generally will not entertain new arguments first raised in a reply brief. See Herbert v. National Academy of Sciences, 974 F.2d 192, 196 (D.C. Cir. 1992). That is especially appropriate where, as here, Plaintiff had not one, but *two* prior briefs in which to raise any such challenges.

## II.    The Relitigation of Exemption 5 would be Futile

Second, even if Plaintiff had seasonably raised a challenge to the application of Exemption 5 (5 U.S.C. § 552(b)(5)), rather than the sole challenge it did – i.e., Defendant's alleged ailure to "satis[y] the elevated harm standard under the FOIA Improvement Act of 2016" (ECF No. 28 at 1) – Plaintiff's argument would still fail. Plaintiff makes numerous affirmative assertions about the legal effect of the draft talking points, all of which amount to the unanticipated Plaintiff's 11th-hour assertion that draft talking points are "not protected by the deliberative process privilege." See Plaintiff's Brief in Support of Renewed Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 4 ("Plaintiff's Renewed OPP/CMSJ")(ECF No. 50). But to this conclusion Plaintiff attaches no

3

supporting legal authority – a failure that carries through to several assertions about the status of the FBI's draft talking points; specifically, that they are "post-decisional;" not deliberative; "not inter-agency discussions, advice opinions, or deliberations contributing to the agency's final decision on the matter." *Id.* at 5. Plaintiff further insists that "how [an] agency communicates and answers questions about the final agency decision . . . [is] not part of the deliberative process intended for the privilege to protect." *Id.* at 6. But Judicial Watch's assertions short on law.[2]

At the heart of Plaintiff's unsupported contention that draft talking points are not protected by Exemption 5's deliberative process privilege is an inexplicable conflation. In glibly describing the draft talking points as post-***decisional***, Plaintiff focuses on the wrong ***decision***. The talking points, it says, "were drafted after the FBI's final decision [not to charge former Secretary of State Clinton] was made and revealed to the public." But, of course, it is not the decision to decline prosecution ("declination decision"), but rather the decision about how best to convey to FBI senior leadership the historically unprecedented, highly scrutinized and complex policy determination that is relevant to the application of the deliberative process privilege in this case ("the messaging decision").

---

[2] When Plaintiff does cite a case in this context, it is inapposite. The 43-year old case, *Jordan v. Dep't of Justice,* 591 F.2d 753 (D.C. Cir. 1978), is a prime example. An authority on the elements of the deliberative process privilege, to be sure, *Jordan* is factually dissimilar from this case. The records in *Jordan* were the actual, final written manifestation of prosecution policies regarding numerous charging standards in D.C. Superior Court. To analogize to the instant case, the records in *Jordan* were the equivalent of "the declination decision" here, not "the messaging decision," which would have had it its corollary in a set of hypothetical talking points for the incumbent United States Attorney for the District of Columbia to use in preparing for a congressional hearing about the policies. *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854 (D.C. Circ. 1980) is, likewise, no support for Plaintiff's position – a conclusion that Chief Judge Howell reached last month in *Ecological Rights Found. v. EPA*, Civ. A. No. 19-983 (BAH), 2021 U.S. Dist. LEXIS 27748 at * (D.D.C. Feb. 13, 2019)(distinguishing *Coastal States* on the basis that its withheld records were "factual descriptions of an already-adopted agency policy rather than discussion about how best to communicate such descriptions, and thus did not implicate the purposes of the privilege").

Plaintiff cites *Jordan* – whose withheld prosecution guidelines *were* the final policies that governed charging and dismissal policies in D.C. Superior Court and, therefore, not pre-decisional – to establish that "communication promulgating or implementing an already decided or established policy or decision are not privileged." 591 F.2d at 774. However, the draft talking points are not "documents for which '[t]he substantive content . . . had already been determined." *See Ecological Rights Found.*, 2021 U.S. Dist. LEXIS 22748 at *55 (*quoting Jordan*, 591 F.2d at 775). Indeed, the very language Judicial Watch quotes from *Jordan* (immediately above) to deny FBI's draft talking points Exemption 5 protection here was explicitly rejected last month by Chief Judge Howell: "[t]his statement, made in reference to documents for which '[t]he substantive content . . . ha[d] [a]lready been adopted," *Jordan*, 591 F.2d at 775, is not dispositive of the privilege's application to any agency's formulation of public statements." *Ecological Rights Found.* at *55.

Draft talking points can be "predecisional as to what is ultimately communicated by [an agency] and deliberative because [they] reveal[] the decisional-making among staff concerning how best to convey [an agency's] position on certain topics, or what a specific policy means in a particular context, or how a policy will [be] implemented in a specific circumstance." *Ecological Rights Found.*, 2021 U.S. Dist. LEXIS 27748 at *55-56. And the courts have generally found that they are – even when crafted after the underlying event about which the press might inquire. *See Protect Democracy*, 320 F. Supp. 3d at 177 (citing several cases). *See also American Ctr. for Law & Justice v. Dep't of Justice*, 325 F. Supp. 3d 162, 171-72 (D.D.C. 2018)("[T]he overwhelming consensus among judges in this District is that the privilege protects agency deliberations about public statements, including the use of talking points.")(citing cases). "The idea is that these sorts of documents reflect deliberation about the ***decision*** of ***how to respond***" to

5

the press,[3] Congress,[4] individual members of the public,[5] or even internal constituencies, as is the case here.[6] Judicial Watch was the plaintiff in many of the cases affirming the application of the deliberative process privilege to draft talking points; its silence here speaks volumes.

### III.   Plaintiff Ignores Binding Circuit and Subsequent Precedent

Third, to read Plaintiff's Renewed Motion and Opposition, one would assume that there is no Circuit authority interpreting the FOIA Improvement Act of 2016 ("FOIA Improvement Act or FIA"), which is at the center of the supplemental briefing the Court facilitated in this case.

---

[3]   *See, e.g.*, *American Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 305 (D.D.C. 2018)("talking points" held "predecisional" because they were prepared "in advance of the press briefings" and "deliberative because they represent [the Bureau of Near Eastern Affairs'] press-related recommendations to [the Bureau of Public Affairs]"); *American Ctr. for Law & Justice v. Dep't of Justice*, 334 F. Supp. 3d 13, 21(D.D.C. 2018)("talking points" held "predecisional because they were 'drafted before and in preparation for communications with the press and public' and are 'a critical aspect of the decision-making process'" and "deliberative in that [they] 'reflect the drafters' opinions and analyses on specific topics and focus on how to best . . . respond to questions'").

[4]   *See, e.g.*, *Protect Democracy*, 320 F. *Supp.* at 177; *Judicial Watch v. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (deeming exempt under the deliberative process privilege records that "discuss[ed] how to respond to on-going inquiries from the press and Congress"); *Judicial Watch, Inc. v. Dep't of Justice*, 306 F. Supp. 2d 58, 71-72 (D.D.C. 2004) (protecting communications prepared to assist an agency head for congressional testimony).

[5]   *See, e.g.*, *Krikorkian v. Dep't of State,* 984 F.2d 461, 466 (D.C. Cir. )(draft letters representing two options for replying to public inquiries about State Department publication delegitimizing Armenian genocide exempt to protect agency's deliberative process); *Leopold v. Office of the Dir. Of Nat'l Intelligence*, 442 F. Supp. 3d 266, 285 (D.D.C. 2020)(proposed talking points for use in communication with foreign officials were "pre-decisional because they were prepared and shared prior to the occurrence of a[n] . . . official communication which would represent a final decision on Defendant State's official position on the subject" and "deliberative because they represent the internal process by which the State Department crafts its statement to third parties")

[6]   *See, e.g., ACLU v. Dep't of Justice*, 844 F.3d 126, 133 (2d Cir. 2016)(internal Justice Department talking points concerning legal basis for drone strikes covered by deliberative process privilege; "[g]overnment officials do not lose the protection of Exemption 5 by considering informally how to present a legal analysis"). That the law permits the protection of the iterative drafts of final talking points intended for broad public release makes its extension to the narrower category of release from the FBI Director to his highest-level leadership all the more justified. *Cf. Judicial Watch v. Dep't of Energy*, 310 F. Supp. 2d 271, 322 (D.D.C. 2004).

In fact, the D.C. Circuit decided *Amadis v. Dep't of State*, 971 F.3d 364 (D.C. Cir. 2020) – its first decision addressing the FOIA Improvement Act's reasonable foreseeability of harm standard – over seven months ago, on August 21, 2020. Yet, nowhere in Judicial Watch's 15-page brief is *Amadis* mentioned, much less discussed. Nor, equally curiously, does Plaintiff address any of the three cases decided since *Amadis* that affirm withholdings of deliberative records over foreseeability of harm challenges.[7]

Judicial Watch misunderstands the FIA's impact. Although the granularity required of declarants describing the impact of disclosures of otherwise exempt records may have increased as a result of the FIA, as Defendant has argued (Defendant's Suppl. MSJ at 3), the FIA has not eliminated or undermined any of the interests the deliberative process privilege protects. Indeed, just this month the Supreme Court reaffirmed the importance of much of what Judicial Watch seeks to strip from deliberative process privilege: "to encourage candor, which improves agency decisionmaking, the privilege blunts the chilling effect that accompanies the prospect of disclosure." *See Fish & Wildlife Serv. v. Sierra Club, Inc.*, No. 19-547, slip op. at 5 (U.S. Mar. 4, 2021). As if predicting the Supreme Court's reaffirmation of candor's importance to quality decisionmaking, *Amadis* embraced it: "Such chilling of candid advice is exactly what the privilege seeks to prevent." 971 F.3d at 371.

The FBI has established harm to the very interests the deliberative process privilege protects and has done so with the quantum and granularity of support this Circuit requires. For instance, the FBI avers without equivocation or challenge that the investigation of the former Secretary of State, at the time she was campaigning for President, was "unprecedented." Second

---

[7] As is pointed out in Defendant's Supplemental Motion, post-*Amadis* Judges Kollar-Kotelly and Sullivan granted summary judgment for agencies upon rebriefing and Judge Mehta did the same in a new case.

Seidel Declaration ("2d Seidel Decl.") at ¶ 5.  The investigation was "high-profile" and Director Comey's connection to it was a "matter of intense public scrutiny."  *Id.* ¶ 5.  "The [draft talking points] were prepared during an intense political climate and addressed a topic that was closely scrutinized by the press, Congress, and members of the public, and the conduct of the investigation and actions of the investigation team were subject to investigations by DOJ's Office of the Inspector General and various Congressional committees."  *Id.* ¶10.  Anyone who lived through that time would recognize as much.

The FBI has established that the harms risked by disclosure were not fanciful, remote or unrelated to the interests the deliberative process privilege exists to protect.  Among other things, the declaration asserts that had the participants in the deliberative process known that their opinions would be subject to public disclosure they would have been reluctant to be fully candid for fear of unwanted scrutiny, thereby harming the deliberative process.  *Id.*  ("[T]he particularized harm in this high-profile case . . . is that these drafters would not comment or add valuable information in an important case of those back and forth raw comments were subsequently released to the public.").  Such knowledge would have caused the drafters to "pull their punches in an effort to avoid attention and scrutiny being directed at them personally," thereby "depriv[ing]] [the agency of] the benefit of full and frank information necessary to make well-informed and considered decisions and impairing the FBI's performance of its mission."  *Id.* ¶ 11.  He also extensively addressed the risk of public confusion – another recognized harm against which the deliberative process privilege is meant to protect.  *Id.* ¶¶ 7-8.

The "deliberative process privilege reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such

8

rigorous deliberation if they feared it might become public." *Judicial Watch v. Dep't of Defense*, 847 F.3d 735, 739 (D.D.C. 2017). Under such intense, unprecedented, and highly-charged circumstances, it takes little imagination to credit the FBI's insistence that "disclosure of the draft documents ***would harm*** the FBI's internal deliberative process." *Id.* ¶ 6. As the quantum and granularity of support in Defendant's declaration as to reasonable foreseeability of harm is no less than what *Amadis* found sufficient – a conclusion Plaintiff's silence concedes—summary judgment should be entered for Defendant.

To the extent Judicial Watch truly claims that "the question is not whether a disclosure ***would*** chill speech, but rather if it is reasonably foreseeable that it ***will*** chill speech," (Pl's Renewed MSJ at 8), it is wrong. Even the statutory language of the FOIA Improvement Act doesn't go that far. As *Amadis* notes: "To withhold a responsive record, an agency must show both that the record falls within a FOIA exemption, 5 U.S.C. § 552(b), and that the agency 'reasonably foresees that disclosure ***would*** harm an interest protected by [the] exemption,'" 971 F.3d at 370 (emphasis added)(*citing* 5 U.S.C. § 552(a)(8)(A)(i)(I)). Rather, Plaintiff misquotes Judge Sullivan. *See Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 1010 (D.D.C.) ("The question is not whether disclosure ***could*** chill speech . . .")(emphasis added). Nor is Plaintiff's very next (unattributed) reference to Defendant's failure to "demonstrate that the release of the *specific records* in this case would be *specifically* likely to cause harm to a protected interest" a requirement to be found in the above referenced case.[8]

---

[8] To the extent these italicized phrases truly denote an applicable standard erroneously separated from its caselaw source, this Defendant's declaration does. The specific harms are familiar to the deliberative process privilege, which aims to avoid them: loss of candor in governmental decisionmaking and public confusion. And they are harms that could reasonably be expected to result from disclosure of the talking points.

For the very first time, Plaintiff offers to permit the redaction of information that would identify the talking points drafters, purporting to mitigate all harm. But no authority is offered for this novel approach. Nor does it solve the problem that disclosure creates. Disclosure is not limited to the identity of the drafters because they might nonetheless be identified contextually. But, even if the identities of the authors could be protected, the risk of chilling effects do not magically dissipate: for where the privilege applies, the agency is entitled to protection of all of the *ideas* and advice that never became part of the a final policy. And their compromise impinges on the open and frank discussions no less so.

Finally, Judicial Watch attacks the FBI's claims of harm. First, it insists that disclosure of the draft talking points "does no harm to the final talking points, which have already been finalized and released [to] the public." Of course, this argument is too clever by half. Were that the standard **no drafts** could ever be withheld. Clearly, that is not the case. As it did in earlier briefing, Judicial Watch fashions out of whole cloth its own legal standards, and sets about to meet them. But "harm" is a proxy for future damage to important interests. There is no backward time travel for policy deliberators; drafters assured of privilege cannot be chilled in their past deliberations on the basis of subsequent releases. See *infra* at 11-12 (discussing *Nat'l Sec. Archive*). Thus, the only operative question is whether the unexpected releases would chill the willingness of either those same participants or others aware of the releases and leave the agency's future decision-making worse for the wear. Once again, the absence of cited authority for its views telegraphs Judicial Watch's continued improvisations.

Second, Plaintiff asserts that "highly likely is not reasonably foreseeable," as a way of suggesting Defendant has failed to satisfy quantum of proof of the requisite proof of harm. Plaintiff's unsupported assertion is utterly conclusory. Nothing in *Amadis* supports such an

assertion. If anything, from a plain language perspective, highly likely sounds more rigorous than reasonably foreseeable – if we are really doing this. More basically, this is nothing more than another instance of cherry picking. Instead of pretending away *Amadis* and the cases decided after it, this time Judicial Watch ignores the "detailed factual support for [the FBI's] claim that disclosure of [the talking points] drafts would harm the agency's deliberative process" (Mem. Op. at 10) – that is, the Second Seidel Declaration. While it may well adopt some level of linguistic variety over the course of its many pages, the FBI has definitely established that "disclosure of the draft documents ***would harm*** the FBI's internal deliberative process." 2d Seidel Decl. ¶ 6.

Judicial Watch's final attack on Defendant's articulation of harm is a series of rhetorical questions designed to telegraph its disdain for the longstanding presumptions identified by the Supreme Court and Circuit Courts of Appeals and long since abided in thousands of FOIA Exemption 5 cases. *See, e.g., United States v. Nixon,* 418 U.S. 683, 705 (1974)("[H]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). This is little more than a repeat of Plaintiff's first point.

As long as there continues to be a deliberative process privilege, there will continue to be a presumption of harm resulting from a compelled disclosure. There has to be: after all, harm to agency decisionmaking is one of the very things that characterizes the privilege in the first place. *See*, *e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). The Circuit's decision in *Nat'l Sec. Archive v. CIA*, 752 F.3d 460 (D.C. Cir. 2014) illuminates:

> "[T]he writer does not need to know at the time of the writing whether the draft will evolve into a final document. But the writer ***needs to know*** at the ***time of writing*** that the privilege will apply and that the draft will ***remain confidential***, in order for the writer t***o feel free to provide candid***

11

*analysis*. A privilege contingent on later events – such as whether the drafter ultimately evolved into a final agency position – would be an uncertain privilege, and as the Supreme Court has said, an uncertain privilege is 'little better than no privilege at all.'"

*Id.* at 463 (*citing Upjohn Co. v. United States,* 449 U.S. 383, 393, 1 (1981); *Swidler & Berlin v. United States*, 524 U.S. 399, 408-09 (1998)).

Whether, in any particular case, harm will come to the decisionmaking process of an agency is a question the agency is best positioned to know. *See, e.g., Competitive Enter. Inst. v. Dep't of Treasury*, 308 F. Supp. 3d 109, 117 (D.D.C. 2018); *Pavement Coatings Tech. Council v. U.S. Geological Survey*, 436 F. Supp. 3d 115, 128 (D.D.C. 2019); *Am. Ctr. for Law*, 330 F. Supp. 3d at 302; *NAACP Legal Def. & Educ. Found, Inc. v. Dep't of Housing & Urban Dev.*, Civ. A. No. 07-3378 (GEL), 2007 U.S. Dist. LEXIS 88027 *36-37 (S.D.N.Y. Nov. 30, 2007). "But that deference is not unlimited. Records withheld under Exemption 5 must legitimately reflect the 'give-and-take of the consultative process' in order to warrant protection from disclosure." *Pavement Coatings*, 436 F. Supp. 3d at 128. Here, they do. Notwithstanding any deference applied, courts are well-equipped to probe the *bona fides* of any assertion and balance competing interests. The FBI has demonstrated harm in a manner consistent with what it is now Circuit law. As such, Defendant respectfully requests that the Court enter summary judgment in its favor.

Dated: March 26, 2021              Respectfully submitted,

                                              CHANNING D. PHILLIPS, D.C. Bar #415793
                                              Acting United States Attorney

                                              BRIAN P. HUDAK
                                              Acting Chief, Civil Division

                                              */s/ John Moustakas*
                                              John Moustakas, D.C. Bar No. 442076
                                              Assistant United States Attorney

555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2518
john.moustakas@usdoj.gov

*Counsel for Defendant*